**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

LEWIS LEE CURNUTTE,

      Plaintiff,

v.                                           CIVIL ACTION NO. 3:19-cv-00515

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Lewis Lee Curnutte ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on July 15, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)  Presently pending before this Court are Claimant's Memorandum in Support of Judgment on the Pleadings (ECF No. 10), the Commissioner's Brief in Support of Defendant's Decision (ECF No. 11), and Claimant's Reply to Brief in Support of Defendant's Decision (ECF No. 12).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 10), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 33 years old at the time of his alleged disability onset date and 37 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 40.)[1]  He is a high school graduate. (*Id.* at 41.)  Most recently, he worked as a truck driver for various trucking companies. (*Id.* at 251.)  Claimant alleges that he became disabled on March 3, 2015, due to bipolar disorder, anger issues, mobility problems, bulging disks, vertigo, high blood pressure, and a neck and spine injury. (*Id.* at 273.)

Claimant protectively filed his applications for benefits on November 20, 2015. (*Id.* at 224–34.)  His claims were initially denied on May 16, 2016, and again upon reconsideration on August 12, 2016. (*Id.* at 140–49, 157–70.)  Thereafter, on September 20, 2016, Claimant filed a written request for hearing. (*Id.* at 171–73.)  An administrative hearing was held before an ALJ on June 13, 2018, in Huntington, West Virginia, with the ALJ appearing from St. Louis, Missouri. (*Id.* at 35–73.)  On June 18, 2018, the ALJ rendered an unfavorable decision. (*Id.* at 10–32.)  Claimant then sought review of the ALJ's decision by the Appeals Council on September 11, 2018. (*Id.* at 222–23.)  The Appeals Council denied Claimant's request for review on May 16, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9.

Claimant timely brought the present action on July 12, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative proceedings (ECF No. 9).  Claimant subsequently filed his Memorandum in Support of Judgment on the Pleadings (ECF No. 10), the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 11), and Claimant filed his Reply to Brief in Support of Defendant's Decision (ECF No. 12).  As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. Mental Health Treatment During Relevant Period

On July 31, 2015, Claimant presented to Prestera Center, Inc. ("Prestera"), a mental health provider, for an initial intake evaluation.  (*Id.* at 389.)  Claimant reported feeling depressed and having difficulty "get[ting] thoughts to finish," as well as feeling angry and "wanting to hurt somebody or hurt [him]self" and having high stress levels.  (*Id.*)  He also related that he was taking medication "to control anger problems," which "helped a lot" but "still doesn't control a single outburst."  (*Id.* at 390.)  The Prestera employee performing the intake consultation noted that Claimant "was patient, cooperative and polite throughout the interview."  (*Id.* at 389.)  Upon mental status examination, she observed that Claimant appeared his stated age, had an "[a]ppropriate" attitude and "[c]ooperative" behavior, had normal speech and "[l]ogical" thought processes with normal thought content, and was alert and fully oriented with intact

memory. (*Id.* at 391–93.) However, she noted that Claimant exhibited lethargic motor behavior and a "[d]epressed" mood and affect, and that he reported "'red rage' episodes: anger and black out episodes, not remembering his actions of aggressive behavior." (*Id.*) She diagnosed Claimant with depressive disorder and generalized anxiety disorder. (*Id.* at 393.)

Claimant began cognitive behavioral therapy with a Prestera psychologist on August 26, 2015. (*Id.* at 429.) Upon mental status examination, she observed that Claimant appeared "[c]asual" and had an "[a]ppropriate" affect, "[f]air" attention and concentration, intact judgment but "[p]artial" insight, normal speech, intact thought processes, and no hallucinations or delusions. (*Id.*) Claimant "reported having 'bad thoughts'" and experiencing "fear" associated with "having these thoughts" but no active thoughts of hurting himself. (*Id.* at 430.) He also told the psychologist that he preferred to have her ask him questions because "it's easier for me to think that way . . . due to over thinking and 'having a lot on my mind all the time.'" (*Id.*) In her plan for Claimant's therapy, the psychologist noted that she would "help[] [Claimant] develop coping strategies for his change in circumstances" and "learn to identify thinking patterns/errors that contribute to his depression and anger." (*Id.*) She directed Claimant to return in one month. (*Id.*)

Claimant also met with a psychiatrist at Prestera for medication management on August 26, 2015. (*Id.* at 445.) He explained that his primary care physician had prescribed him anxiety medication and an antidepressant, which Claimant described as "very helpful," but his overall response to treatment was "not very good." (*Id.*) Claimant reported "racing thoughts" that led to difficulty sleeping, worrying, and "over-analyz[ing]." (*Id.*) He also related that he had been divorced for about a year and that he

was fired from his employment as a truck driver after an on-the-job accident and became homeless. (*Id*.) Upon mental status examination, the psychiatrist observed that Claimant was "smelly," had an "anxious" mood and affect, and had "fair" memory, insight, and judgment. (*Id*. at 447.) He diagnosed Claimant with depressive disorder and generalized anxiety disorder but noted that Claimant might suffer from bipolar disorder. (*Id*. at 448.) He also prescribed lithium in addition to the medications prescribed by Claimant's primary care provider. (*Id*. at 449.)

At his next appointment with his psychiatrist on September 24, 2015, Claimant reported "that he never felt this good" and that the lithium was "very helpful." (*Id*. at 451.) He reported decreasing his usage of his anxiety medication. (*Id*.) Upon mental status examination, the psychiatrist observed that Claimant had "some hand tremor" but "no psychomotor activation or retardation" and that his memory, judgment, and insight were "fair." (*Id*. at 453.) He noted that Claimant's status was "[i]mproving" and recommended a decrease in Claimant's antidepressant dosage "since concern for bipolar." (*Id*. at 455.) He also ordered testing to determine whether Claimant's hand tremors were related to the lithium dosage. (*Id*.) He directed Claimant to follow up in one month. (*Id*.)

On September 28, 2015, Claimant returned to therapy with his psychologist at Prestera. (*Id*. at 431.) He reported having difficulty sleeping and increased depression but related feeling "less angry." (*Id*. at 432.) Upon mental status examination, Claimant appeared "[d]isheveled" and had "[p]artial" insight, perseveration of speech, and "[c]ircumstantial" thought processes. (*Id*. at 431.) But his psychologist observed that he had a "[c]ooperative" manner, "[a]ppropriate" affect, "[g]ood" attention and concentration, and intact judgment, and Claimant reported that his mood was "a little better." (*Id*.) She recommended that Claimant return in one month. (*Id*. at 432.)

Claimant presented to his primary care physician on October 13, 2015, and reported that he had been diagnosed with bipolar disorder and was taking additional psychotropic medication. (*Id.* at 415.) The physician did not note any objective findings regarding Claimant's mental state during the appointment. (*Id.* at 415–16.)

Claimant returned to his psychiatrist at Prestera on November 20, 2015, reporting that his primary care physician had reduced the dosages of his antidepressant and anxiety medication. (*Id.* at 457.) Claimant stated that the lithium his psychiatrist prescribed "is helpful" but "is not doing as much as it did in the beginning." (*Id.*) He reported that his mood and anxiety were "doing ok" but that he still suffered from difficulty sleeping and "some hand tremor." (*Id.*) Aside from "[f]air" attention and concentration, the psychiatrist's findings on mental status examination were normal. (*Id.* at 458–59.) He noted that Claimant was "[i]mproving" and recommended tapering off his antidepressant use. (*Id.* at 460.) He again directed Claimant to follow up in one month. (*Id.*)

On December 2, 2015, Claimant presented to his psychologist for therapy, reporting that he "just about went ballistic on" a fellow resident of his apartment complex and "kept running [his] mouth, but [he] didn't do anything." (*Id.* at 434.) He related having "a super bad day" the day prior to his appointment and was "irritable" and "pissed off." (*Id.*) Claimant felt it was due to a reduction in the dosage of his antidepressant medication. (*Id.*) He also reported difficulty sleeping due to nightmares. (*Id.*) Claimant's psychologist observed upon mental status examination that Claimant appeared "[c]asual" and had a "[c]ooperative" manner, "[a]ppropriate" affect, and no hallucinations or delusions. (*Id.* at 433.) She further noted an "irritable" mood, "[f]air" attention and concentration, mildly impaired judgment, "[p]artial" insight, rapid speech, and "[c]ircumstantial" thought processes. (*Id.*) Importantly, she noted that Claimant had

homicidal ideation.  (*Id.* at 434.)  She practiced a breathing technique with Claimant during the session, and Claimant stated that it reduced his anxiety "from initial 7 to 3." (*Id.*)  She planned to inform Claimant's psychiatrist of his "reported status and concerns" and directed Claimant to return in one month.  (*Id.*)

Claimant next presented to his psychiatrist on March 15, 2016, and reported that he was unable to taper off his antidepressant and that he continued to experience "racing thoughts all the time, affecting sleep at night" and felt "[v]ery uncomfortable around people." (*Id.* at 495.)  Claimant recalled being "knocked out" in two car accidents and that his anger and memory "got worse" afterward.  (*Id.*)  He stated that "[m]oney is the main stress" because "[h]e has no income."  (*Id.*)  Upon mental status examination, Claimant's psychiatrist observed that Claimant was "irritable, anxious, and moderately depressed," and although his thoughts were "linear for the most part," his insight and judgment were "somewhat limited," and he had increased memory loss.  (*Id.* at 497.)  The psychiatrist modified his diagnosis and stated that Claimant's symptoms were "more [traumatic brain injury] than real bipolar."  (*Id.* at 498.)  Claimant was instructed to continue his medication regimen and return in two months.  (*Id.*)

On April 6, 2016, Claimant presented to his primary care provider for a regular follow-up appointment.  (*Id.* at 505.)  His primary care provider directed him to see his psychiatrist at Prestera for treatment for his chronic anxiety and depression and bipolar disorder.  (*Id.* at 506.)  He did not make any objective findings regarding Claimant's mental status.  (*Id.*)  Claimant returned to his primary care provider for a routine appointment on September 26, 2016.  (*Id.* at 1236.)  He reported being "not happy" with his psychiatrist at Prestera and told his primary care physician that "[h]e did not want to return there."  (*Id.*)  He also reported that the lithium the psychiatrist prescribed "has

been ineffective." (*Id.*) Claimant's primary care provider prescribed a new medication to treat his bipolar disorder. (*Id.* at 1237.) He made no objective findings regarding Claimant's mental status. (*Id.*)

Several months later, on February 21, 2017, Claimant presented to his primary care provider after a short hospital stay for pneumonia. (*Id.* at 1232.) He reported that his bipolar disorder was "under better control" but requested an increase in the dosage of his medication, and his primary care provider acquiesced. (*Id.* at 1233.) He again reported that the lithium his psychiatrist prescribed to treat his mental health conditions was "ineffective." (*Id.*) Claimant's primary care provider did not make any objective findings relating to Claimant's mental status. (*Id.*) On July 14, 2017, Claimant returned to his primary care provider and stated that he was "still having some trouble with anger management." (*Id.* at 1260–61.) He reported "drink[ing] a pint of vodka last night" and using marijuana. (*Id.* at 1260.) Claimant's primary care provider ordered a drug screen and switched his antidepressant. (*Id.* at 1261.) He directed Claimant to continue using his medication for bipolar disorder and to follow up at Prestera for treatment. (*Id.*)

Claimant presented to a new primary care provider to establish care on August 22, 2017. (*Id.* at 1278.) He reported a history of bipolar disorder and treatment with medication. (*Id.* at 1279.) Claimant was instructed to continue his current medication and "see psychiatry next week." (*Id.* at 1280.) His primary care provider made no objective findings about his mental status. (*Id.* at 1279–80.)

After nearly a year and a half without specialized mental health treatment, Claimant returned to Prestera for a psychiatric evaluation with psychiatrist Dr. Afiah Ahsan, M.D. ("Dr. Ahsan") on August 28, 2017, "seeking help for his anger problems" and desiring to stop using his anxiety medication. (*Id.* at 1264.) Dr. Ahsan observed that

8

Claimant "upon interview was somewhat hostile but as the interview progressed his demeanor changed significantly." (*Id.*) Claimant reported often being angry and "becom[ing] enraged for little things" and told Dr. Ahsan that "his stressors are health problems, not being able to work and financial troubles." (*Id.*) He described symptoms of "low interest in pleasurable activities, poor sleep and impaired concentration and memory." (*Id.*) Dr. Ahsan noted "low frustration tolerance." (*Id.*) Upon mental status examination, she observed that Claimant's appearance was appropriate, his eye contact and speech were normal, he had a "[c]ooperative" attitude, and his motor activity was "[c]alm." (*Id.* at 1265.) She noted that Claimant described his mood as "okay for now" and observed that his affect was "[b]road," his thought processes were "[g]oal [d]irected" and "[l]ogical" with "[a]ppropriate" thought content, and he had no suicidal or homicidal thoughts. (*Id.*) Dr. Ahsan noted that Claimant was alert and fully oriented and of average intellect, and his judgment and insight were intact, but his recent memory was impaired. (*Id.*) She diagnosed Claimant with medication-induced anxiety disorder and prescribed two new medications while instructing him to discontinue use of his old medication. (*Id.* at 1266–67.) She did not believe his mental health problems were caused by a traumatic brain injury. (*Id.* at 1267.) Dr. Ahsan stated that Claimant's prognosis was "[f]air." (*Id.*)

At his next appointment with his new primary care provider on September 22, 2017, the physician noted that Claimant "has a [history] of anxiety/panic attacks and has been following with psychiatry." (*Id.* at 1276.) He did not make any objective findings regarding Claimant's mental status. (*Id.* at 1276–77.)

When Claimant returned to Dr. Ahsan on October 9, 2017, "he reported that he is doing much better and is [75%] calmer than before" and that "his anger outburst[s] occur at a much [lower] frequency and intensity." (*Id.* at 1330.) Upon mental status

examination, Dr. Ahsan observed that Claimant's general appearance was "[c]asual," and he had a "[e]uthymic" affect, "[c]alm" motor activity, good attention and concentration, normal speech, and intact memory, judgment, and thought processes. (*Id.* at 1331.) Claimant described his mood as "okay," and Dr. Ahsan noted that he was fully oriented and had no suicidal or homicidal ideation or self-injurious behavior. (*Id.* at 1331–32.) She explained that he "has improved affective state with occasional anger episodes that are much less severe" and that he had "[s]uccessfully" stopped using the benzodiazepines other providers had prescribed. (*Id.* at 1333.) She started him on a new medication, increased the dosage of the medication she previously prescribed, and instructed him to follow up in three months. (*Id.*)

Claimant returned to his primary care provider on December 1, 2017, and he reported that "he feels really good today" and that the medications Dr. Ahsan prescribed "are working." (*Id.* at 1284.) His primary care physician did not make any objective findings about his mental status. (*Id.* at 1284–85.)

However, on February 26, 2018, Claimant presented to Dr. Ahsan and "reported that he is not doing well and his anxiety is bad and that he does not want to get out of the house as he feels people watch him." (*Id.* at 1335.) She noted that Claimant "endorsed nightmares, feeling edgy, irritable, unable to relax, shakes over thought of going out" and "denied any depression but requested help with his anxiety." (*Id.*) Upon mental status examination, Dr. Ahsan observed that Claimant appeared "[c]asual" and had a "[b]road" affect and "[r]estless" motor activity but normal speech, "[f]air" attention and concentration but intact memory, and was fully oriented with intact judgment and "[p]resent" insight and no hallucinations or delusions, suicidal or homicidal thoughts, or self-injurious behavior. (*Id.* at 1336–37.) She instructed Claimant to continue his current

medications and prescribed two new medications to treat anxiety and paranoia. (*Id.* at 1338.) She directed him "to return in 3 months or as needed." (*Id.*)

    2. *Consultative Psychological Examination: Angela Null, M.S.*

Claimant underwent a consultative psychological examination with Angela Null, M.S. ("Ms. Null"), a psychologist, on April 4, 2016. (*Id.* at 488–92.) She conducted a clinical interview, mental status examination, and records review. (*Id.* at 488.)

Upon mental status examination, Ms. Null observed that Claimant was "casually dressed with adequate hygiene" and "appeared his stated age." (*Id.* at 489.) She noted that Claimant "was generally cooperative" and his "eye contact varied" and that his "[s]peech was a little pressured and tangential at times as well as somewhat loquacious, but was generally logical." (*Id.*) She further noted that Claimant's mood was "mildly irritable" with a "constricted" affect. (*Id.*) But she observed him to be fully oriented, with normal thought processes and thought content and intact judgment and insight. (*Id.*) She also observed that Claimant's immediate memory "was intact," his recent memory "was mildly deficient," and his remote memory "was generally intact." (*Id.*) Ms. Null noted that Claimant had "adequate" concentration, "generally intact" persistence, and "mildly pressured" pace. (*Id.*)

During the clinical interview, Claimant reported that his doctors would not permit him to return to work due to his bipolar disorder. (*Id.* at 490.) Ms. Null observed that Claimant "presented with symptoms of manic as well as depressive episodes." (*Id.*) She noted that his "most recent episode can be characterized as manic with symptoms including racing thoughts, agitation, anger outbursts, irritability, and sleep disturbances." (*Id.*) She further noted that Claimant "also reported depressive episodes characterized by feelings of sadness and hopelessness, crying spells, fatigue, and suicidal ideation without

a plan." (*Id.*)  In addition, Ms. Null noted that Claimant "presented with excessive anxiety and worry occurring on a nearly daily basis with accompanying symptoms of difficulty concentrating, restlessness, muscle tension, irritability, fatigue, and sleep disturbances." (*Id.*)  She observed that Claimant suffered from chronic pain that "causes clinically significant disturbances in social, occupational, and daily functioning." (*Id.*)  She stated that Claimant's "social functioning during the examination was mildly deficient based on clinical observations of social interactions . . . i.e., eye contact, mannerisms, sense of humor, appearance, etc." (*Id.* at 491.)

Ms. Null diagnosed Claimant with moderate bipolar disorder "based upon [his] presentation with recurrent major depressive as well as manic episodes" and the fact that he was being treated by a psychiatrist for bipolar disorder.  (*Id.*)  She also diagnosed Claimant with generalized anxiety disorder "based upon [his] presentation with a history of daily anxiety and worry accompanied by symptoms including difficulty concentrating, restlessness, muscle tension, fatigue, irritability, and sleep disturbances." (*Id.*)  Finally, she diagnosed Claimant with moderate somatic symptom disorder with persistent pain "based upon [his] presentation with chronic pain, in which psychological factors as well as general medical conditions are believed to play important roles" and the fact that his "persistent pain causes clinically significant disturbances in social, occupational, and daily functioning." (*Id.*)  She described Claimant's prognosis as "[p]oor." (*Id.* at 492.)

   *3. Opinion Evidence*

      *a. State-Agency Psychological Consultants: Dr. James Binder, M.D. and Dr. John Todd, Ph.D.*

At the initial disability determination level, state-agency psychological consultant Dr. James Binder, M.D. ("Dr. Binder"), a psychiatrist, performed a mental residual

functional capacity ("RFC") assessment of Claimant. (*Id.* at 86–87, 102–03.) Dr. Binder opined that Claimant had no understanding and memory limitations, sustained concentration and persistence limitations, or adaptation limitations. (*Id.* at 86, 102–03.) He did opine, however, that Claimant had social interaction limitations. (*Id.* at 86, 102.) Specifically, although Dr. Binder opined that Claimant's abilities to interact appropriately with the general public, ask simple questions or request assistance, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness were "[n]ot significantly limited," he opined that Claimant's abilities to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes were "[m]oderately limited." (*Id.*) Dr. Binder explained, "Claimant likely would have difficulty in the above areas but he does appear capable of learning and performing basic work-like tasks." (*Id.* at 87, 103.)

At the reconsideration level, Dr. John Todd, Ph.D ("Dr. Todd"), a psychologist, adopted Dr. Binder's opinions. (*Id.* at 116, 119–20, 131, 134–35.)

       *b.  Dr. Afiah Ahsan, M.D.*

On May 21, 2018, Claimant's psychiatrist, Dr. Ahsan, completed a "Mental Assessment of Ability to Do Work-Related Activities" form for Claimant. (*Id.* at 1364–66.) She diagnosed Claimant with "generalized anxiety disorder, major depressive [disorder], alcohol use [disorder] (in sustained remission), and cannabis use [disorder] (in sustained remission)." (*Id.* at 1365.) She stated that he received treatment monthly or every two weeks. (*Id.*)

When asked to rate Claimant's abilities to "mak[e] occupational adjustments," Dr. Ahsan opined that Claimant had "[m]arked" limitations—meaning his "ability to function is severely limited and results in the inability to consistently and appropriately function

from 1/3 to 2/3 of an eight hour work day or forty hour work week"—in following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, and maintaining attention and concentration. (*Id.* at 1364–65.) When asked to "[d]escribe any limitations and include the medical/clinical findings that support this assessment," Dr. Ahsan responded that Claimant "has anxiety and panic [disorder], chronic pain which limits his functionality." (*Id.* at 1365.)

Next, when asked to rate Claimant's abilities to "mak[e] performance adjustments," Dr. Ahsan opined that Claimant had "[m]arked" limitations in understanding, remembering, and carrying out complex job instructions, detailed but not complex job instructions, and simple job instructions. (*Id.*) She explained that Claimant "has impaired attention and concentration due to anxiety and depression which is not improving due to pain." (*Id.*)

When asked to rate Claimant's abilities to "mak[e] personal social adjustments," Dr. Ahsan opined that Claimant had "[m]oderate" limitations—meaning that Claimant's "ability to function is moderately limited and may result in sub-standard job performance up to 1/3 of a normal eight hour work day or forty hour work week"—in maintaining personal appearance and "[m]arked" limitations in behaving in an emotionally stable manner, relating predictably in social situations, and his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 1364, 1366.) In support of her opinion, she explained that Claimant "has severe anxiety, low mood, anhedonia, panic attacks." (*Id.* at 1366.)

Finally, when asked to "[s]tate any other work-related activities which are affected by the impairment, and indicate how the activities are affected" and "the medical/clinical findings to support this assessment," Dr. Ahsan responded, "Ability to perform his job, come to work punctually is impaired along with interactions with co-workers due to mood disturbance." (*Id*.)

Dr. Ahsan further opined that Claimant was capable of managing benefits in his own best interest. (*Id*.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),

15

416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's [RFC]" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks

16

omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20

C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.   20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'"  *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635).  "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations."  *Id.* (quoting *Mascio*, 780 F.3d at 635).  If the claimant can perform other work, the ALJ will find her "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot perform other work, the ALJ will find her "disabled."  *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision.  (Tr. at 15.)  He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability.  (*Id.*)  He found that Claimant's bipolar disorder, anxiety, carpal tunnel syndrome, obesity, degenerative disc disease, and hypertension constituted "severe" impairments.  (*Id.* at 16.)  However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 16–19.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except [he] can frequently balance, stoop, kneel, crouch, crawl, handle, finger, and feel with the left hand, push or pull controls with the left upper

18

extremity, and climb ramps or stairs" and "occasionally climb ladders, ropes or scaffolds." (*Id.* at 19.)  The ALJ further found that Claimant "should avoid concentrated exposure to extreme temperatures, environmental irritants, and hazards such as unprotected heights and dangerous machinery." (*Id.*)  In addition, the ALJ found that Claimant "is capable of performing simple routine tasks in a low stress work environment[,]" which the ALJ defined "as jobs having only occasional decision making and occasional changes in the work setting," and that Claimant "can have occasional contact with co-workers and supervisors, but cannot have any contact with the public." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform his past relevant work. (*Id.* at 23–24.)  He noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 24.)  Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as a routing clerk/mail sorter, marking clerk, or advertising material distributor. (*Id.* at 24–25.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . from March 3, 2015, through the date of this decision." (*Id.* at 25.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it

must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ failed to accord proper weight to the opinions of his treating psychiatrist, Dr. Ahsan, and did not adequately explain why he rejected her opinions. (ECF No. 10 at 4–9.) He asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 9.) The Commissioner responds that the ALJ appropriately rejected Dr. Ahsan's opinions as extreme and inconsistent with the record and that he properly relied on the opinions of the state-agency psychological consultants, Dr. Binder and Dr. Todd, in rendering his RFC assessment. (ECF No. 11 at 16–19.) Claimant replies that the Commissioner failed to respond to the arguments Claimant made in his opening brief and asserts that the ALJ ignored probative evidence and did not explain how he resolved conflicts between Dr. Ahsan's opinions and those of Dr. Binder and Dr. Todd. (ECF No. 12 at 1–2.)

When determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam).  A treating physician's opinion about a claimant's condition may be given "greater weight" than that of a non-treating physician "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.*  "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.*

The ALJ in this case assigned "little weight" to Dr. Ahsan's opinions that Claimant "had marked limitations in areas including interacting with others, dealing with work stresses, understanding and following even simple tasks, and completing a normal work day or work week without psychological interruptions" because "such extreme limitations are not supported by the evidence in the record."  (Tr. at 23.)  More specifically, he explained that Dr. Ahsan's opinions were inconsistent with her "own records from October 2017, which noted [Claimant] reported doing much better with medication, as well as recent records from April 2018 which found that [Claimant] had a normal mood and affect."  (*Id.*)  Claimant argues that the ALJ's analysis ignores Dr. Ahsan's February 2018 treatment notes describing Claimant's reported setback in his anxiety and fails to

reference any evidence conflicting with Dr. Ahsan's opinions.  (ECF No. 10 at 7–8.)  He further argues that Dr. Ahsan's opinions were consistent with those of the state-agency psychological consultants, Dr. Binder and Dr. Todd, which were assigned "great weight," and the findings of consultative examiner Ms. Null.  (*Id.* at 8; *see* ECF No. 12 at 2.)

The ALJ's evaluation of Dr. Ahsan's opinions is supported by substantial evidence. Fundamentally, the ALJ found that the "significant limitations" set forth in her opinions "are inconsistent with the objective evidence in the record."  (Tr. at 23.)  This is an appropriate reason for the ALJ to discount a medical opinion, even one from a treating physician.  *Mastro*, 270 F.3d at 178.  In his review of the medical evidence of record relating to Claimant's mental impairments as part of the RFC assessment, the ALJ explained that he limited Claimant "to the reduced range of simple, low stress jobs . . . including those requiring limited interpersonal interaction" due to Claimant's "history of treatment for bipolar disorder and anxiety."  (Tr. at 21.)  But the ALJ found "that the record does not support any greater limitations" because of "the relatively normal findings on objective examination despite [Claimant's] routine and conservative treatment, as well as the evidence in the record showing that [Claimant's] symptoms have improved and stabilized with treatment."  (*Id.*)  He then went on to summarize Claimant's mental health treatment notes, including Dr. Ahsan's February 2018 treatment notes that Claimant asserts he "completely ignored."  (Tr. at 22; *see* ECF No. 10 at 7.)  He explained that the medication change Dr. Ahsan approved at that appointment "was seemingly effective, as [Claimant's] most recent medical records, from April 22, 2018,[2] noted he had a normal mood and affect."  (Tr. at 22; *see id.* at 1360.)  Claimant suggests that this evidence is "non-probative" and that the ALJ's reliance on it is "misplaced" because

---

[2] It appears that Claimant's appointment was actually on April 18, 2018.  (Tr. at 1358.)

Claimant presented to the specialist who made those findings for an evaluation of his vertigo. (ECF No. 10 at 7.) However, he provides no support for the premise that an ALJ must automatically reject mental status findings made by a physician specializing in a discipline other than psychiatry. Indeed, that premise seems to be at odds with the general directive that the ALJ must "consider all evidence in [the claimant's] case record" in determining whether the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). And it is especially inappropriate when, as here, there are no contemporaneous mental status findings made by a mental health specialist.

For the same reasons, Claimant's argument that the ALJ did not sufficiently explain how he resolved the inconsistencies between Dr. Ahsan's opinions and those of state-agency psychological consultants Dr. Binder and Dr. Todd is likewise without merit. (ECF No. 12 at 2.) As an initial matter, in his opening brief, Claimant states that Dr. Ahsan's opinions were in fact "consistent with" Dr. Binder's and Dr. Todd's. (ECF No. 10 at 8.) As he points out, Dr. Binder and Dr. Todd, like Dr. Ahsan, opined that Claimant would have difficulty getting along with others in the workplace. (*Id.*; *see* Tr. at 86, 102, 1364–66.) The ALJ accounted for these limitations by restricting Claimant "to the reduced range of low stress, simple tasks . . . including those requiring limited interpersonal interaction." (Tr. at 22.) He also explained that he gave "great weight" to Dr. Binder's and Dr. Todd's opinions because they "are internally consistent and well supported by a reasonable explanation and the available evidence." (*Id.*) Again, in his review of the medical evidence of record relating to Claimant's mental impairments as part of the RFC assessment, the ALJ noted "the relatively normal findings on objective examination despite [Claimant's] routine and conservative treatment, as well as the evidence in the record showing that [Claimant's] symptoms have improved and stabilized

23

with treatment." (*Id.* at 21.) Put simply, the ALJ gave more weight to Dr. Binder's and Dr. Todd's opinions than he did to Dr. Ahsan's because Dr. Ahsan's were "extreme" and not supported by the bulk of the objective findings throughout Claimant's treatment. (*Id.* at 21–23.) He explained that and cited to record evidence to support it. (*Id.*) Nothing more is required. SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (stating that ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight").

As such, the undersigned **FINDS** that the ALJ adequately explained the weight he accorded to Dr. Ahsan's opinions.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 10), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.

Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 9, 2020

Dwane L. Tinsley
United States Magistrate Judge

25